**UNITED STATES of America, Appellee,**

v.

**Atlas Norris PUGH, Jr., Appellant.**

No. 93–2745.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 17, 1993.

Decided May 31, 1994.

---

Daniel O'Brien, Cedar Rapids, IA, argued, for appellant.

Daniel Christopher Tvedt, Cedar Rapids, IA, argued, for appellee.

Before LOKEN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

Atlas Norris Pugh, Jr., was convicted by a jury of five drug-trafficking charges. He was sentenced to 168 months of imprisonment. He appeals, arguing that the district court erred by (1) denying his motion to suppress incriminating statements on the ground that law enforcement officers interrogated him after he asserted his right to remain silent, (2) admitting those statements into evidence at trial despite an alleged delay by law enforcement officers in presenting him to a magistrate judge, and (3) finding that he was responsible for 54.2 grams of crack cocaine. We affirm.

I.

On July 24, 1992, Detective Jeff Rayburn received a tip that Pugh would drive from Chicago to Galena, Illinois, the next day with crack cocaine. Detective Rayburn was a member of the Jo Daviess County, Illinois, Sheriff's Department and was assigned to a drug enforcement unit of the Illinois State Police. After receiving the tip, the state police planned to apprehend Pugh so that they could intercept his shipment of drugs and execute an outstanding arrest warrant they had for Pugh. At about 1:30 a.m. on Saturday, July 25, 1992, about two miles east of Galena, Illinois, officers stopped Pugh because he was driving 38 miles per hour in a 30–mile–per–hour zone. Officers arrested Pugh and informed him of his *Miranda* rights, both orally and in writing. An officer searched Pugh's passenger and found about 4.2 grams of crack cocaine on her person. An officer then obtained her consent to search the car, which she owned, and he found one more rock of crack cocaine.

Pugh was taken to the Jo Daviess County jail. At 4:30 a.m., Detective Rayburn approached Pugh and asked him whether he wanted to cooperate in a drug-trafficking investigation. Pugh said he did not. At noon, Detective Thomas Fessler, a member of the Dubuque, Iowa, Police Department and of a Northern District of Iowa federal drug task force, arrived at the jail. Detective Fessler was accompanied by Thomas Parker, a Dubuque police officer, and was later joined by Detective Rayburn. From November 1991 to July 1992, Detective Fessler had investigated Pugh for drug trafficking in Dubuque (which is about 15 miles west of Galena). During that period, informants had attempted to buy both crack and powder cocaine from Pugh on twelve occasions; they had succeeded on four occasions. So when Detective Fessler arrived at the jail, he asked Pugh whether he wanted to cooperate in Fessler's drug-trafficking investigation. Pugh said he did not. The magistrate judge found that the three officers began to leave but that as they were walking down the hall and away from Pugh, Pugh yelled to them, "F--- it, I might as well get this over with." The three officers returned, and Pugh made statements to them about his drug-trafficking activities in Dubuque.

On August 20, 1992, the government filed an indictment alleging four distribution counts and one conspiracy count. A jury later returned verdicts of guilty on all counts. Pugh appeals from the district court's judgment entered July 8, 1993.

II.

■ Pugh first argues that the district court should have granted his motion to suppress the statements he made in the Jo Daviess County jail because the officers violated his right to remain silent and his right to counsel.[1] After conducting an evidentiary hearing, a magistrate judge[2] recommended that Pugh's pretrial motion to suppress be

---

1. Pugh attempts to invoke *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), which held that officers may not initiate an interview after a suspect asserts his right to *counsel. Id.* at 484–85, 101 S.Ct. at 1884–85. But the magistrate judge found that Pugh did not assert his right to counsel. (*See* Supp.R. at 8–9.) That finding is not clearly erroneous. Therefore,

we analyze Pugh's argument as one relying solely on his right to remain silent.

2. The Honorable John A. Jarvey, Chief Magistrate Judge, United States District Court for the Northern District of Iowa.

denied. A district judge [3] overruled Pugh's objections to the report and recommendation and denied the motion. We review the district court's denial of his motion to suppress for clear error. *United States v. McClinton,* 982 F.2d 278, 281 (8th Cir.1992).

Once in police custody and subject to interrogation, a person must be informed of his constitutional right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 473 [86 S.Ct. 1602, 1627, 16 L.Ed.2d 694] (1966). If the right is asserted, the interrogation must cease. When a suspect invokes the right, however, the police are not entirely prohibited from reinitiating questioning. *Michigan v. Mosley,* 423 U.S. 96 [96 S.Ct. 321, 46 L.Ed.2d 313] (1975). Nothing "in the *Miranda* opinion can sensibly be read to create a *per se* proscription by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03 [96 S.Ct. at 326]. Instead, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Id.* at 104 [96 S.Ct. at 326]. In *Mosley,* the Supreme Court relied on three factors to determine whether the police "scrupulously honored" the person's right of silence: "(1) there was an immediate cessation of questioning upon defendant's request; (2) a 'significant amount of time' had passed since the last session and a new set of [*Miranda*] warnings was given; and (3) the second interrogation involved inquiries concerning a separate crime." *United States v. House,* 939 F.2d 659, 662 (8th Cir.1991) (citing *Mosley*).

*McClinton,* 982 F.2d at 281 (alteration in original).

■ While Pugh was in custody, he twice asserted his right to remain silent. He changed his mind after the second time, but he argues that officers violated his right to remain silent when they continued to interview him. We disagree. The first *Mosley* factor is present because each time Pugh asserted his right, law enforcement officers immediately ceased questioning. The second *Mosley* factor also is present. Officers waited seven-and-one-half hours before approaching Pugh the second time. *See Hatley v. Lockhart,* 990 F.2d 1070, 1074 (8th Cir.1993) (approving two-hour interval); *McClinton,* 982 F.2d at 282 (approving seven-hour interval). The officers informed Pugh of his right to appointed counsel at the noon encounter. Although the officers did not give Pugh a complete set of fresh *Miranda* warnings at the noon encounter, their failure to inform Pugh of his right to remain silent or that any statement could be used against him is immaterial because Pugh actually asserted these rights and the officers respected the assertion by terminating the interview and walking away. A complete set of *Miranda* warnings would have served Pugh no better. *See Stumes v. Solem,* 752 F.2d 317, 321 (8th Cir.), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985). Likewise, the third *Mosley* factor is present because the topics of the two proposed interviews were different. Detective Rayburn first asked Pugh about drug-trafficking in Illinois, while Detective Fessler later asked Pugh about drug-trafficking in Dubuque, Iowa. *See McClinton,* 982 F.2d at 282 (holding that third factor is present where two interviews are conducted by officers from different jurisdictions); *cf. Hatley,* 990 F.2d at 1074 (holding that "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview"). Thus, the magistrate judge did not err by finding that law enforcement officers "scrupulously honored" Pugh's assertions of his right to remain silent.

■ The magistrate judge further found that law enforcement officers did not " 'wear down [Pugh's] resistance' in order to change [his] version of the facts." *McClinton,* 982 F.2d at 282 (quoting *Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327). We agree. Pugh was not denied his right to remain silent when he made statements about his drug-trafficking activities. In sum, the district court did not err when it denied Pugh's pretrial motion to

---

**3.** The Honorable William C. Stuart, then a Senior District Judge, United States District Court for the Southern District of Iowa, sitting by designation, now retired.

suppress because of an alleged violation of his right to remain silent.

## III.

■ Pugh next argues that his incriminating statements should have been suppressed because the government failed to timely present him to a federal magistrate judge for an initial appearance. The government responds that Pugh did not preserve this issue for appeal. We note that Pugh did not raise the issue in his motion to suppress, in his memorandum in support of his motion to suppress, or in his objections to the magistrate judge's report and recommendation. At the beginning of the suppression hearing, Pugh's counsel merely stated, "I don't know if this is an issue." (Suppression Tr. at 4.) Pugh's counsel later asked witnesses questions that are somewhat relevant to this issue, but counsel never asked for a ruling. Because counsel's tentative statement is insufficient to properly present the issue to the district court, we review for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* — U.S. —, — – —, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993); *United States v. Montanye,* 996 F.2d 190, 192 (8th Cir.1993) (en banc).

■ Pugh's primary contention is based on Fed.R.Crim.P. 5(a), which states that arresting officers "shall take the arrested person without unnecessary delay before the nearest available federal magistrate," and on a statute that provides, in part:

In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, *shall not be inadmissible solely because of delay* in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and *if such confession was made or given by such*

*person within six hours immediately following his arrest or other detention....*

18 U.S.C. § 3501(c) (emphasis added). Pugh draws our attention to the second portion we have highlighted. He essentially contends that his incriminating statements should be inadmissible because he incriminated himself more than six hours after his arrest.

We need not decide whether Pugh has correctly interpreted subsection (c) because his argument fails for a more fundamental reason: subsection (c) applies only to confessions made *after* a person is arrested on *federal* charges. As the Supreme Court recently explained,

the "arrest or other detention" of which the subsection speaks must be an "arrest or other detention" for a violation of *federal* law.... If, instead, the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated. This is true even if the arresting officers (who, when the arrest is for a violation of state law, almost certainly will be agents of the State or one of its subdivisions) believe or have cause to believe that the person also may have violated federal law.... As long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered.

*United States v. Alvarez–Sanchez,* — U.S. —, —, 114 S.Ct. 1599, 1600, 128 L.Ed.2d 319 (1994). The Court reasoned that "delay" cannot occur until an officer has a duty to present a person to a federal magistrate judge and that such a duty "does not arise until the person has been arrested for a *federal* offense." *Id.* at —, 114 S.Ct. at 4291.

■ Like the defendant in *Alvarez–Sanchez,* Pugh was arrested by state officers for violations of state law. He was arrested on July 25, 1992, and he made incriminating statements that same day, but he was not indicted for violations of federal law until August 20, 1992. There was no "delay" in Pugh's presentment because, at the time he made his incriminating statements, there was no obligation to present him to a federal magistrate judge. Thus, Pugh cannot rely

on § 3501(c) to require the suppression of a confession made more than six hours after his arrest on a state warrant. *See id.* at ——, 114 S.Ct. at 4292.[4]

■ Pugh's secondary contention is that even if suppression is not accomplished by § 3501(c), his statements should have been suppressed on the basis of *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), and *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Collectively, these two cases hold that, under a federal court's supervisory authority over the administration of criminal justice in the federal courts, a defendant's incriminating statements should be inadmissible at trial if the defendant made them during an unreasonable delay between his arrest and his presentment to a judicial officer. *See Mallory,* 354 U.S. at 451–56, 77 S.Ct. at 1357–60; *McNabb,* 318 U.S. at 339–47, 63 S.Ct. at 612–16. These two cases, however, no longer are the governing law for the determination whether incriminating statements are inadmissible due to a delay between a defendant's arrest and his initial appearance. Due to Congress's concern that *McNabb* and *Mallory* focussed too much on delay and too little on a confession's voluntariness, the present rule of law is simply that a confession "shall be admissible in evidence if it is voluntarily given." 18 U.S.C. § 3501(a); *see also United States v. Jackson,* 712 F.2d 1283, 1286 (8th Cir.1983); *United States v. Bear Killer,* 534 F.2d 1253, 1256–57 (8th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976). Delay between arrest and presentment is only one of five factors a trial judge must consider when determining whether a confession was voluntary, *see* 18 U.S.C. § 3501(b), but delay is not dispositive, *see Jackson,* 712 F.2d at 1286–87.

■ Because Pugh failed to properly present this issue to the district court, the district court did not make, and therefore we cannot review, any explicit findings on the voluntariness factors specified by 18 U.S.C. § 3501(b). However, in the context of Pugh's claim that his right to remain silent had been violated, the magistrate judge found that officers did not coerce Pugh into making the incriminating statements, and we have affirmed that ruling. We also have concluded that Pugh was informed of his *Miranda* rights. *See id.* § 3501(b)(3)–(4). To the extent that the time between Pugh's state arrest and his incriminating statements is relevant to the determination of voluntariness, *compare id.* § 3501(b)(1) (stating that trial judge shall consider "time elapsing between arrest and arraignment"), *with Alvarez–Sanchez,* —— U.S. at ——–——, 114 S.Ct. at 1601 (holding that time between state arrest and incriminating statement is not relevant to subsection (c) because no "delay" exists prior to federal arrest), we find that it does not weigh heavily in Pugh's favor. Pugh incriminated himself approximately 10 hours after his arrest. This period of time is not appreciably longer than the six-hour "safe harbor" of § 3501(c) and was quite reasonable given that Pugh was arrested in the wee hours of a Saturday morning. Under a plain-error standard of review, we have no difficulty concluding that Pugh's confession was voluntary, as required by § 3501(a). Thus, we reject Pugh's argument that his incriminating statements should have been suppressed because of any alleged delay in presenting him to a judicial officer.

## IV.

■ Pugh last argues that the district

---

4. We believe this is not one of those "rare" cases where, despite an arrest by state officers on state charges, § 3501(c) is implicated because state and federal officers colluded to deprive a person of his right to a prompt presentment. *See Alvarez–Sanchez,* —— U.S. at ——, 114 S.Ct. at 1604–05; *see also Anderson v. United States,* 318 U.S. 350, 352–56, 63 S.Ct. 599, 600–02, 87 L.Ed. 829 (1943) (applying *McNabb* where defendants were investigated for possible violations of federal law and state officers' conduct was not authorized by state law); *United States v. Jensen,* 561 F.2d

1297, 1299 (8th Cir.1977) (holding that defendant can invoke federal law if he can show that "a federal-state working arrangement [was] used to circumvent the requirement that an arrestee be taken before a magistrate without unnecessary delay"). It is plain from the record that Pugh's state custody was justified by the prospect of a state prosecution. Although federal, Illinois, and Iowa authorities had had conversations about Pugh before his arrest, the record clearly shows that those officers had not conclusively determined that Pugh would be prosecuted in federal court.

court[5] erred when it found that he was responsible for 54.2 grams of crack cocaine. Pugh argues that the district court should have found him responsible for only 7.11 grams, an amount that would have implicated a lesser base offense level and a lower sentencing range. We will reverse and remand for resentencing if we determine that the district court sentenced Pugh in violation of law or as a result of a misapplication of the Sentencing Guidelines. *See* 18 U.S.C. § 3742(f); *Williams v. United States,* —— U.S. ——, ——, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992). We review the district court's quantity findings for clear error. *United States v. Cassidy,* 6 F.3d 554, 557 (8th Cir.1993).

Pugh contends that the district court should not have considered the testimony of Detective Fessler, who related to the district court the incriminating statements Pugh had made in the Jo Daviess County jail. Under the Sentencing Guidelines, a district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a), p.s. Pugh's contention is weakened considerably by the fact that we have affirmed the district court's denial of his motion to suppress these statements before trial. Furthermore, Pugh does not dispute the fact that Detective Fessler was at the jail on the day of his arrest or the fact that they had a conversation. We believe that these circumstances bear sufficient indicia of the probable accuracy of Detective Fessler's testimony. Thus, the district court did not err by considering that testimony.

 Pugh also contends that the district court should have applied a clear-and-convincing standard of proof on the issue of drug quantity. We have held that a preponderance-of-the evidence standard applies at a sentencing hearing. *See United States v. Galloway,* 976 F.2d 414, 425–26 (8th Cir. 1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 790 (1993).

Pugh asks us to require a higher evidentiary standard in this case because, he argues, the district court's consideration of the conduct for which he was convicted *and* his other relevant conduct, *see* U.S.S.G. § 1B1.3(a)(1), subjects him to a potential sentence that is four times the length of the potential sentence that would apply if the district court considered only the conduct for which he was convicted. (*See* Appellant's Br. at 29–31 (citing *United States v. Kikumura,* 918 F.2d 1084 (3d Cir.1990).) Pugh's argument stumbles on the fact that, in addition to four counts of distribution, he also was convicted of one count of conspiracy, an offense that necessarily includes quantities other than the 2.91 grams attributable to the four distribution counts. *See United States v. Behler,* 14 F.3d 1264, 1272 (8th Cir.1994) (holding that heightened evidentiary standard may be applied only where increase in sentence is due to uncharged relevant conduct). Pugh's contention also fails because a four-fold increase in his potential sentence is not large enough to require a heightened evidentiary standard. *See Galloway,* 976 F.2d at 426 (applying preponderance standard despite three-fold increase in potential sentence); *United States v. Coleman,* 990 F.2d 419, 421 (8th Cir.1993) (same); *cf. United States v. Townley,* 929 F.2d 365, 369–70 (8th Cir.1991) (questioning whether seven-fold increase in potential sentence would require heightened standard). Thus, this contention also fails.

 Pugh finally contends that the evidence in the record simply is insufficient to support the district court's finding. We disagree. The district court based its quantity determination on Detective Fessler's testimony that Pugh had received 1,000 to 1,500 rocks of crack cocaine from his suppliers. The district court explicitly stated that Detective Fessler's testimony was credible. The district court then estimated the weight of the 1,000 to 1,500 rocks to be 100–150 grams by using an average weight of 0.1 grams per rock. The district court then used the lowest figure within that range (100 grams) and discounted it by estimating that

---

5. The Honorable Michael J. Melloy, Chief Judge, United States District Court for the Northern District of Iowa.

Pugh diverted one-half of the crack cocaine to his personal use. To this amount (50 grams), the district court added ·the 4.2 grams of crack that were found when Pugh was arrested. The resulting quantity (54.2 grams) was easily within the 50– to 150–gram range necessary for a base offense level of 32. *See* U.S.S.G. § 2D1.1(c)(6).

We find no error in the district court's methods. "Where there is no drug seizure *or the amount seized does not reflect the scale of the offense,* the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1, comment. (n. 12) (emphasis added); *see also United States v. Brown,* 19 F.3d 1246, 1248 (8th Cir.1994). Here, the average weight of 0.1 grams per rock was an appropriate approximation given the actual weight of two samples of crack cocaine that were purchased from Pugh and later weighed. (*See* Exs. 3A (0.076 g./rock), 12A (0.12 g./rock)). In addition, a district court's credibility determinations are "virtually unreviewable on appeal." *See United States v. Casas,* 999 F.2d 1225, 1230 (8th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 894, 127 L.Ed.2d 86 (1994). Furthermore, as a whole, the district court's methodology worked in defendant's favor. Thus, we conclude that the district court's findings in this case are not clearly erroneous. In sum, the district court did not err when it found Pugh responsible for 54.2 grams of crack cocaine and sentenced him accordingly.

## V.

In conclusion, the judgment of the district court is affirmed.